Filed 2/8/23  P. v. Karels CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM ANTHONY KARELS,<br><br>    Defendant and Appellant. | B319323<br><br>(Los Angeles County<br>Super. Ct. No. MA080988) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Lindsay Boyd, Deputy Attorney General, for Plaintiff and Respondent.

_____

Johnny Powell was killed when a speeding car crossed the road, struck him as he walked on the far shoulder, made a U-turn and ran over him as he lay in the street. The murder car was found, abandoned, badly damaged and with no license plates, the following morning.

William Anthony Karels was the predominant (overwhelming) contributor of DNA present on the steering wheel and gear shift of the car used in the murder. Only tiny amounts of DNA from other, unknown individuals were detected at those sites. Karels's DNA was also found immediately adjacent to a large hole cut in the driver's side of the windshield where the vehicle identification number (VIN) had been removed. In addition, an eyewitness described the driver as a light-skinned White or Hispanic male with facial hair, a description, albeit a general one, consistent with Karels's physical characteristics and one that did not match the car's owner.

On appeal Karels argues his conviction for the premeditated murder of Powell was not supported by substantial evidence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Murder of Johnny Powell*

Powell was struck twice by an automobile on the evening of August 24, 2020 near a bar on Trevor Avenue in Lancaster. He died from his injuries several hours later. Surveillance video from the bar showed Powell walking toward the northeast corner of Trevor Avenue and West Ovington Street (away from the bar) when a car, later determined to be a 2003 Chevrolet Monte Carlo, driving southbound on Trevor Avenue struck Powell on the east shoulder of the road, knocking him into the side of an adjacent

building.[1]  The car drove out of camera range and then returned, now moving in a northbound direction, and ran over Powell as he lay in the street.

Victor Palomo was at the scene, outside the bar, when he heard a loud "thump."  He turned and saw a motionless body lying on the ground approximately a block away.  Palomo also saw a car, just beyond the body, make a U-turn.  As Palomo watched, the car drove over Powell's body and left the scene.  Palomo immediately reported the incident, and Los Angeles County deputy sheriffs arrived to investigate.  Palomo described the car to the deputies and stated the driver was a "light skin White or Hispanic" male "with facial hair."

2.  *The Investigation and DNA Analysis*

The following day, a mile from the scene of the incident, sheriff's deputies found a car that, based on a review of the bar's surveillance footage, appeared to be the vehicle that ran over Powell.  In addition to collision damage, a large hole had been cut in the lower left quadrant of the windshield (the driver's side) where the metal plate displaying the VIN should be located.[2]  The

---

[1]  An overhead or aerial photograph of the area near the bar was admitted into evidence at trial.  It was used to explain to the jury Powell's movement, the murder car's path and the location of witness Victor Palomo in relation to the car's impact.

[2]  Federal law requires every vehicle have a VIN, which for passenger cars must "be located inside the passenger compartment" and "readable, without moving any part of the vehicle, through the vehicle glazing under daylight lighting conditions by an observer having 20/20 vision (Snellen) whose eye-point is located outside the vehicle adjacent to the left windshield pillar."  (Vehicle Identification Number (VIN) Requirements, 49 C.F.R. § 565.13(f) (2023); see generally

VIN had been removed, and the car's license plates were missing. There was blood on the undercarriage of the car, which the sheriff's department, through DNA analysis, determined belonged to Powell. Deputies swabbed locations on the windshield and the interior of the car, including the steering wheel and the gear shift, for additional DNA evidence.

Meanwhile, through its investigation the sheriff's department learned that Karels had received a citation while driving the car in Lancaster on August 6, 2020. On that occasion the deputy who issued the citation determined the car's registered owner was Bryan Haddock. The sheriff's department later retrieved records documenting Haddock's sale of the car for $200 on July 31, 2020 to Earl Cager. A color copy of Cager's driver's license, introduced at trial, indicated Cager was a dark-skinned Black male. Investigators were unable to locate Cager at any of the addresses listed on the documents they obtained.

Sheriff's deputies interviewed Karels and took a sample of his DNA. They also obtained a blood sample card from the coroner following Powell's autopsy. Laboratory analysis established Karels was the predominant contributor to DNA samples taken from the car's steering wheel, where he

---

*Albertson's, Inc. v. Kirkingburg* (1999) 527 U.S. 555, 559, fn. 2 ["Herman Snellen was a Dutch ophthalmologist who, in 1862, devised the familiar letter chart still used to measure visual acuity. The first figure in the Snellen score refers to distance between the viewer and the visual target, typically 20 feet. The second corresponds to the distance at which a person with normal acuity could distinguish letters of the size that the viewer can distinguish at 20 feet"].)

contributed more than 99 percent of the DNA,[3] with a tiny amount from an unknown contributor, and gear shift, where Karels contributed 94 percent of the DNA, with the remaining amount from an unknown contributor. Testing samples from the perimeter of the car's windshield revealed in one instance Powell was the single source contributor and in another Powell contributed 96 percent and Karels contributed 4 percent of the DNA present. The sample around the large cutout in the windshield where the VIN plate had been removed, however, revealed a 52 percent contribution from Karels, 46 percent from Powell, and a remaining 2 percent from an unknown contributor.

3. *Karels's Conviction for the Murder of Powell*

The People charged Karels with murder (Pen. Code, § 187, subd. (a)). At the jury trial in March 2022 the People called six witnesses: Palomo; Deputy Sheriff Felipe Alejandre, who initially responded to Palomo's report of the incident; Deputy Sheriff Trevor Mangan, who issued Karels the citation on August 6, 2020; Detective Cynthia Toone, the sheriff's department homicide detective assigned to investigate the case; Christopher Lee, a senior criminologist in the sheriff's department, who collected the DNA samples from the car that ran over Powell; and James Nieman, another senior criminologist in the sheriff's department, who analyzed the DNA samples collected by Lee. The prosecutor introduced into evidence several exhibits used during his examination of the People's witnesses,

---

[3] The criminologist who analyzed the DNA samples testified there were two contributors to the steering wheel sample but described Karels's DNA profile as aligning "with the 100 percent component of the steering wheel sample."

including color photographs of the damaged Monte Carlo and surveillance videos from the bar.

Deputy Mangan testified that, during the traffic stop of the Monte Carlo Karels was driving, he ran the license plate on the vehicle and learned the vehicle's registration was expired and Karels was not the registered owner. The citation, admitted into evidence as a defense exhibit, included the car's license plate number (confirming the plates were still on the vehicle at that time), stated the traffic stop had been conducted at Meech Street and Milling Avenue in Lancaster and described Karels as a six-foot one-inch White male with brown hair and blue eyes. It did not indicate there was a very large hole or similar defect in the vehicle's windshield.

While describing the investigation of Powell's death, Detective Toone identified a photograph of the Monte Carlo's windshield, taken several days after the incident, which showed a large hole over most of the lower left side of the windshield, "right above where the VIN plate is normally located on a car." Detective Toone testified the VIN plate "had been removed." Detective Toone also explained the database search that revealed the sale of the Monte Carlo on July 31, 2020 from Haddock to Cager for $200; the acquisition of a copy of Cager's driver's license with his photograph, which was admitted into evidence; and her inability to locate Cager at any of the addresses listed for him.

Nieman described the results of his analysis of various DNA samples taken from the car. In response to a question from the prosecutor, Nieman testified, "DNA can be degraded over time if it is subject to certain environmental insults," and gave as examples "extreme heat" and "exposure to ultraviolent radiation."

Neither term was further defined on either direct or cross-examination. When questioned by defense counsel, Nieman acknowledged that DNA testing cannot determine when a sample was deposited on an item.

Karels did not testify or call any witnesses in his defense. In his closing argument Karels's counsel argued, because there was no way to determine when DNA was deposited, the People's evidence did not prove Karels was driving the car when it ran over Powell, only that he had been driving the car at some point—specifically on August 6 when he received the traffic citation. Defense counsel discounted the significance of Palomo's description of the murder car's driver, stating, "The Antelope Valley is full of light-skinned, White or Hispanic males with facial hair." And he pointed out the People had not suggested any motive for the murder or introduced any evidence Karels knew or was associated with Powell in any way.[4] Finally, defense counsel emphasized CALCRIM No. 224, included in the court's instructions, and explained it meant to convict Karels the jury had to believe "the only reasonable theory in this case is that Mr. Karels was driving the car on August 24th. If you believe other scenarios are reasonable, then you have to find my client not guilty. . . . I don't think, given the gaps and the problems with the evidence, that anyone can logically argue or logically believe that the prosecutor's theory of the case is the only reasonable thing, the only thing that could've happened."

---

[4] In his rebuttal closing argument the prosecutor reminded the jury that motive was not an element of the crime and explained, "It's not that there's no motive. It's that we didn't go into a motive. There's no evidence of a motive. It's not that there's no motive."

7

The jury convicted Karels of first degree murder. The trial court sentenced him to an indeterminate state prison term of 25 years to life. Karels filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

"To decide whether the evidence is sufficient to support a jury verdict, 'a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" (*People v. Sanchez* (2016) 63 Cal.4th 411, 453-454.)[5] In applying this test, we "'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Sandoval* (2015) 62 Cal.4th 394, 423.) "'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294; see *People v. Navarro* (2021) 12 Cal.5th 285, 339 ["[s]ubstantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence," internal quotation marks omitted].)

---

[5] Because we must review the entire record to determine if substantial evidence supported the jury's verdict, necessarily we are not limited in that assessment by what evidence the prosecutor elected to emphasize in closing argument or the Attorney General discussed in his brief or at oral argument.

To constitute substantial evidence, an inference ""may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work."" (*People v. Davis* (2013) 57 Cal.4th 353, 360; see Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"]; *People v. Hughes* (2002) 27 Cal.4th 287, 365 ["a jury may not rely upon unreasonable inferences," and "'[a]n inference is not reasonable if it is based only on speculation'"]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 735 ["'speculation is not evidence, less still substantial evidence'"].)[6]

"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court, which must be

_____

[6]     "Fundamentally, whether evidence 'raises' or 'supports' a particular inference is a matter of probability.  Relevant evidence increases the apparent probability a particular fact is true.  Some evidence increases that apparent probability greatly, and other evidence does so slightly.  There is a point on this spectrum above which the probabilistic connections between the evidence and proposed inference are deemed 'reasonable' and below which weaker probabilistic connections are deemed 'speculation' or 'conjecture.' [Citation.]  In this way, the law distinguishes between facts that can 'logically and reasonably be drawn' from the evidence [citation] versus evidence which 'merely raises a possibility' a particular fact is true.  [Citation.]  The former is called a reasonable inference; the latter is called speculation and is 'not a sufficient basis for an inference of fact.' [Citation.]  At the margins, it can be difficult to demarcate between the two." (*People v. Bell* (2020) 47 Cal.App.5th 153, 180.)

convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Harris* (2013) 57 Cal.4th 804, 849-850 [cleaned up]; accord, *People v. Manibusan, supra*, 58 Cal.4th at p. 97.)

      2. *The Limits on the Probative Value of Fingerprint (or DNA) Evidence*

Fingerprints and DNA share two fundamental characteristics. When fully preserved and properly analyzed, they provide unassailable evidence of the identity of the individual from whom they came. And notwithstanding advances in scientific techniques, it is generally not possible to determine when they were left on an object. Emphasizing this latter common feature and citing case law involving fingerprints, Karels contends the DNA evidence indisputably linking him to the murder car was insufficient to support his conviction for killing Powell.

Karels relies principally on *People v. Trevino* (1985) 39 Cal.3d 667 (*Trevino*), disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221, which we are obligated to follow, and *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353 (*Mikes*), which, at most, has persuasive value here. In *Trevino* the Supreme Court reviewed the dismissal of murder charges against Leonard Rivas, one of two defendants charged with the murder of their friend Rollo Hinton. (*Trevino*, at p. 676.) Hinton had been found dead in the bedroom of his ransacked apartment. The cause of death was a blow to the back of the head. The possible murder weapon, a steam iron, was found next to the body. (*Id.* at

p. 677.)  A neighbor of the victim testified she saw Jeremiah Trevino leave Hinton's apartment on the afternoon of the murder. At the same time she heard a groan coming from inside the apartment and saw a tall, slender, clean-shaven man emerge from the apartment.  The neighbor identified Trevino, but not Rivas, at a live line-up and admitted at trial she could not positively identify Rivas as the man she saw that afternoon. However, she stated, "This man carried himself in the same manner as Rivas did in the courtroom."  (*Ibid*.)

The only other evidence linking Rivas to the scene of the crime was one fingerprint found on a dresser drawer in the victim's bedroom.  (*Trevino*, *supra*, 39 Cal.3d at p. 678.)  One of Trevino's prints was also on the dresser, and two of Hinton's and two of another individual's were on a whiskey bottle in the living room.  (*Ibid*.)  The fingerprint expert was unable to estimate the age of the print, and another witness testified that Trevino and Rivas visited Hinton at Hinton's apartment on occasion.  (*Ibid*.)

According to the trial court's ruling on a new trial motion, Rivas at the time of the crime was neither slender nor clean-shaven (he had a moustache).  (*Trevino*, *supra*, 39 Cal.3d at p. 696.)  The Supreme Court held the combination of the neighbor's "highly speculative and equivocal identification testimony" and the "solitary fingerprint of some unknown vintage" were insufficient as a matter of law to support a guilty verdict.  (*Id*. at p. 697; accord, *People v. Redmond* (1969) 71 Cal.2d 745, 756 [defendant's fingerprint at the scene of a burglary was insufficient to support his conviction because he was previously at the scene lawfully].)

In *Mikes*, *supra*, 947 F.2d 353 the murder victim was found in his basement after a burglary.  (*Id*. at pp. 355-356.)  The

prosecution's case rested solely on the presence of the defendant's fingerprints on the murder weapon, a portion of a disassembled turnstile the victim had recently purchased at a hardware store's going-out-of-business sale. (*Ibid*.) The Ninth Circuit held this evidence was insufficient to support the conviction, reasoning, "[I]n fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while committing the crime in question*, the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." (*Id.* at pp. 356-357.) But the court went beyond the reasonable inference requirement and added, to meet this standard, "the prosecution must present evidence sufficient to permit the jury to conclude that the objects on which the fingerprints appear were inaccessible to the defendant prior to the time of the commission of the crime." (*Id.* at p. 357.) The prosecution had introduced no evidence placing the defendant at the scene of the crime, either on the day of the murder or on any other occasion; and, because the turnstile presumably had been in operation before being sold and was available to the public when offered for sale by the hardware store, the evidence was insufficient to preclude the reasonable possibility the defendant's fingerprints were on the item prior to the victim's acquisition of it. (*Id.* at pp. 358-359.)

The Ninth Circuit's strict requirement the prosecution present proof the item bearing the defendant's fingerprints was inaccessible to the defendant prior to the time of the commission of the crime was not followed by the Supreme Court in *People v. Johnson* (2019) 8 Cal.5th 475, a case not cited by Karels. The *Johnson* Court considered the admissibility of evidence the

12

defendant had raped a woman as an aggravating circumstance during the penalty phase of a capital murder case.  (*Id.* at p. 515.) As the Court explained, to be admissible the trial court had to determine the evidence offered would allow a rational trier of fact to decide beyond a reasonable doubt the defendant had committed the criminal activity alleged (*ibid.*)—the same standard we use to determine whether substantial evidence supports a conviction.  The sole evidence connecting the defendant to the rape was his fingerprint on the magazine (gun clip) of a firearm used in the rape and found at the site of that crime.

The defendant in *Johnson*, relying on *Mikes*, *supra*, 947 F.2d 353, argued the evidence he committed the rape was insufficient because the magazine was a movable object, and there was no evidence he could not have accessed it prior to its use by whomever committed the rape.  (*People v. Johnson*, *supra*, 8 Cal.5th at pp. 515-516.)  The Supreme Court rejected the contention such evidence was required, effectively adopting a more lenient standard.  Noting simply there was no reasonable explanation for how the defendant's fingerprint could have been left on the magazine—the defendant did not know the man from whom the gun had been stolen nor had the defendant been inside the gun owner's home before the theft—the Court held *Mikes* was "easily distinguished" because, unlike the turnstile pole in that case, "there was no evidence the magazine was accessible to the general public before the crime against [the rape victim]."  (*Id.* at p. 516.)  That is, the *Johnson* Court did not require the prosecutor to prove the item was, in fact, totally inaccessible to the defendant prior to the crime, but only that the evidence did not preclude a rational trier of fact from finding beyond a

13

reasonable doubt the fingerprint was left on the magazine during (or in preparation for) the offense.

3. *Substantial Evidence Supports the Jury's Finding That Karels Killed Powell*

Because it is undisputed Karels was driving the Monte Carlo on August 6, 2020, the presence of his DNA on the steering wheel and gear shift did not prove beyond a reasonable doubt he was the individual who murdered Powell and, standing alone, would not be sufficient evidence for us to affirm his conviction. To a lay jury, of course, the minimal presence of DNA from other individuals in those places inside the car certainly suggested Karels was the most recent driver and hence the killer. But under *Trevino, supra*, 39 Cal.3d 667, more is required. It is possible, at least based on what the prosecution's DNA expert said and, more importantly, did not say, the individual driving the car on August 24, 2020 was wearing gloves and, as a result, neither left his own DNA nor wiped away the DNA previously left by Karels. There could also be other explanations—certainly speculative, but potentially plausible as a matter of DNA science—for how Karels's DNA retained its dominant presence on the steering wheel and the gear shift although someone else was driving the car when it ran over Powell. Expert testimony could have addressed those evidentiary gaps. The People did not present it.

But the jury had significantly more evidence on which to base its finding that Karels was guilty of murder than his DNA inside the car. As discussed, the traffic citation Karels received on August 6, 2020 indicated he was a White male with brown hair and blue eyes, a description generally consistent with Palomo's testimony the driver was a "light skin White or

14

Hispanic" male "with facial hair." In addition, the jury was entitled to compare Palomo's description to Karels's physical characteristics. (See, e.g., *People v. Montalvo* (1971) 4 Cal.3d 328, 335 ["a view of the defendant by the trier of fact in an appropriate case may be sufficient to support a finding that the defendant is an adult"]; *People v. Castaneda* (1994) 31 Cal.App.4th 197, 203 [jury's observation of defendant's apparent age properly considered in determining sufficiency of the evidence to establish defendant was more than 10 years older than minor victim of sexual abuse]; see also Simons, Cal. Evidence Manual (2022 ed.) § 1.2 ["Observations about a party or witness made by the trier of fact may be evidence regardless of whether or not the person testifies. If relevant, observations of a party's appearance are evidence. . . . The jury may compare the defendant's appearance to the witness's description of the perpetrator"].) Because under substantial evidence review we presume the existence of every fact the jury could have reasonably deduced from the evidence it heard and saw, we necessarily presume Karels met that description.[7] And as general as that description may have been, it had far more probative value than the neighbor's speculative and unreliable identification of the second perpetrator at issue in *Trevino*, *supra*, 39 Cal.3d 667. In addition, the evidence established that Cager, the owner of the Monte Carlo, did not

---

[7] Although statements by counsel are not evidence (see, e.g., *People v. Ramirez* (2021) 10 Cal.5th 983, 1033; *People v. Cook* (2007) 40 Cal.4th 1334, 1359), Karels's lawyer confirmed the propriety of the presumption that Karels was a light-skinned White or Hispanic man with facial hair by arguing in his closing that many men in the area where the murder occurred match that description, not that his client did not.

match Palomo's description of the driver and thus could reasonably be excluded as Powell's killer.[8]

Moreover, in addition to the DNA in the interior of the Monte Carlo, Karels's DNA was found, mixed with Powell's, on the edge of the large cutout in the windshield above where the VIN plate had been removed. (Nieman testified there was a 52 percent contribution from Karels, 46 percent from Powell, and a remaining 2 percent from an unknown contributor.) Powell's DNA was also found elsewhere on the periphery of the car's windshield as the single source contributor at one location and as contributing 96 percent (with Karels contributing 4 percent) at another.

It was certainly reasonable for the jury to infer, as the prosecutor argued in his closing, because Karels knew he had been linked to the Monte Carlo as a result of the traffic stop and citation 18 days earlier, he cut open the windshield after the murder in order to remove the car's VIN plate in an effort to avoid detection as Powell's killer, leaving his DNA next to the

---

[8] As Justice Segal acknowledges in his dissent, no demographic information concerning the number of individuals who reside in Los Angeles County and who might match Palomo's description of the driver of the murder car was introduced at trial. But if this type of statistical analysis were pertinent to determining whether substantial evidence supported Karels's conviction, the appropriate inquiry would not be the probability that someone matching that description was driving the Monte Carlo in Los Angeles County on the day of the murder but the probability that two different individuals matching that description would be driving a car, not owned by either of them, in the City of Lancaster within 18 days of each other. The answers to those questions would likely be very different.

hole in the process. To be sure, there was no direct evidence of when the hole was cut and the car's VIN and license plates removed.[9] However, based on the People's post-murder photographs, the jury could logically and reasonably conclude it must have been after Powell was hit and the car was being abandoned because it was not feasible the car was driven for any distance with a hole extending over nearly one quarter of the windshield directly in front of the driver.

As for Powell's DNA on edges of the windshield, including in the area near the cutout, from Palomo's testimony and the surveillance video, it would be reasonable to conclude it was left there, as was the DNA extracted from blood on the car's undercarriage, as a result of Powell being struck by the car. While our dissenting colleague correctly points out that nothing in Palomo's testimony or the surveillance video indicates Powell's body was thrown onto the windshield of the Monte Carlo, that evidence indisputably established Powell was hit twice by the front end of the vehicle. It seems a clear example of a reasonable inference, not "simply guesswork," for the prosecutor to argue, and the jury to deduce, that Powell's DNA on the windshield, including near the large cutout, was the result of those two assaults.[10]

---

[9] Deputy Magnan's testimony he ran the vehicle's license plate during the August 6, 2020 traffic stop, as well as the notation of the plate number on the citation, established that the license plates were still on the car on that date. And it is unlikely the deputy would not have noted (at least) a very large hole in the windshield.

[10] Neither criminalist testified whether Powell's or Karels's DNA on the windshield had been extracted from blood or other biological deposits. In his closing argument the prosecutor

One could certainly conjure another explanation for why Karels's DNA was at the precise location of the cutout on the windshield, just as could have been done with respect to the fingerprint evidence on the gun magazine in *People v. Johnson*, *supra*, 8 Cal.5th 475.  But unlike in *People v. Trevino*, *supra*, 39 Cal.3d at pages 696 to 697, where the Supreme Court quoted the trial court's assessment that there was "'no reason to presume'" the defendant's fingerprint "'was made on the day of the murder as opposed to some other occasion,'" here it was logical and reasonable to conclude Karels's DNA next to the cutout had been deposited on the day Powell was killed.

In sum, taken together, Karels's DNA on the steering wheel and gear shift, his DNA next to the cutout from the windshield above the location of the car's missing VIN plate, and his match to the general description of the driver provided by Palomo reasonably justified the jury finding Karels guilty of first degree murder.  Whether or not there was also an explanation of the evidence suggesting Karels's innocence, as defense counsel argued to the jury when discussing CALCRIM No. 224, a reversal of the judgment is not warranted.  (See *People v. Manibusan*, *supra*, 58 Cal.4th at p. 97.)

---

indicated (without objection) Karels's had come from blood on the edge of the windshield cutout.

18

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.


I concur:


FEUER, J.

SEGAL, J., Dissenting.

I respectfully dissent from the majority's valiant effort, largely unaided by the People, to find substantial evidence to support Karels's conviction. I agree with the majority that—as in *People v. Trevino* (1985) 39 Cal.3d 667, where a fingerprint and equivocal identification were insufficient to support the defendant's conviction—the presence of Karels's DNA on the steering wheel and gear shift was not, without more, substantial evidence to support his conviction. But the majority attempts to escape the holding of *Trevino* by saying there was "significantly more evidence" of Karels's guilt. I don't think there was, and that's where we differ.

The first additional piece of evidence the majority cites is the description in the August 6, 2020 traffic citation of Karels as a White male with brown hair and blue eyes, which the majority asserts was "generally consistent with" Palomo's description of the perpetrator as a "light skin White or Hispanic" male "with facial hair." Significantly, in his respondent's brief, the Attorney General does not cite or rely on any evidence of Karels's skin color or physical appearance or any other evidence suggesting Karels matched Palomo's description. Nor did the Attorney General accept our invitation to do so at oral argument. Which is understandable, given the (as I see it) negligible probative value of Karels matching the exceedingly broad description of a White or Hispanic male.

The majority justifiably resorts to the phrase "generally consistent." It is difficult to know which demographic figures to use or how to use them, but as long as we are going to make inferences without assistance from the parties, I would observe

that the most recent figures available from the United States Census Bureau[11] indicate that 75.4 percent of California's estimated population of 39,029,342 is either White or Hispanic and that 50 percent is male.  That's 14,714,062 White or Hispanic male Californians.  Conservatively excepting from this number the percentage that is under 18 years old and therefore may be less likely to drive a car or grow significant facial hair (22.4 percent) leaves 11,418,112 Californians plausibly matching Palomo's description.  That Karels was one of at least 11 million people who could have been driving the car that hit Powell seems hardly more probative than the "highly speculative and equivocal identification testimony" in *People v. Trevino*, *supra*, 39 Cal.3d at page 697.[12]

---

[11]     Available at <https://www.census.gov/quickfacts/fact/table/CA,US/PST045222, PST045221.> [as of Feb. 6, 2023], archived at < https://perma.cc/U379-XUAH>.

[12]     If we were going to use figures for Los Angeles County (available at <https://www.census.gov/quickfacts/fact/table/losangelescountycal ifornia,CA/PST045221> [as of Feb. 6, 2023], archived at < https://perma.cc/JBM9-4H3H>.):  74.4 percent of the county's estimated population of 9,829,544 is either White or Hispanic and 49.6 percent is male, which leaves 3,627,338 White or Hispanic males.  Adjusting to exclude those under the age of 18 (21.1 percent) would narrow to 2,861,970 the number of Los Angeles County residents plausibly matching Palomo's description.

The majority asserts that, from the jury's opportunity to observe Karels at trial, "we necessarily presume Karels met [Palomo's] description" of the driver. It is not clear from this assertion whether the majority is presuming Karels had light skin and facial hair. If so, I have reservations about presuming those facts. The majority cites a treatise stating that a jury's "observations of a party's appearance are evidence" (Simons, California Evidence Manual (2022 ed.) § 1.2) and the well-established principle that we presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Sandoval* (2015) 62 Cal.4th 394, 423). Thus, in considering the possibility the jury deduced from its observation of Karels at trial that he matched Palomo's description, the question is: Was such a deduction reasonable? And the answer depends on what Karels looked like. Besides the traffic citation's description of him as White and male, we have no evidence of what Karels looked like. Therefore we cannot say the jury could have "reasonably deduced" anything more probative from its observation of Karels at trial than that he was White and male. In sum, while we must presume the existence of facts the jury could have reasonably inferred from the evidence, we must not infer the existence of evidence to support deductions we presume were reasonable.

Neither of the cases the majority cites (and the parties did not) on this issue, *People v. Montalvo* (1971) 4 Cal.3d 328 (*Montalvo*) and *People v. Castaneda* (1994) 31 Cal.App.4th 197 (*Castaneda*), applies here. In what the court in *Castaneda* identified as "dictum" (*Castaneda,* at p. 203), the Supreme Court in *Montalvo* discussed the evidence required to prove a defendant's age for the offense of furnishing a narcotic to a minor

by an adult, in violation of Health and Safety Code section 11502. The Supreme Court in *Montalvo* observed: "'Experience teaches us that corporal appearances are approximately an index of the *age* of their bearer, particularly for the marked extremes of old age and youth.'" (*Montalvo*, at p. 335, italics in original.) The Supreme Court went on to state that "a view of the defendant by the trier of fact in an appropriate case may be sufficient to support a finding that the defendant is an adult. In any event, the information or indictment must contain the necessary language as to age and in jury trials, the jury must be properly instructed as to all of the elements of the offense." (*Id.*, at pp. 335-336.)

The court in *Castaneda, supra*, 31 Cal.App.4th 197 cited this discussion in concluding a jury's observation of the defendant and the victim in that case, "corroborated by . . . testimony" the defendant "was an adult man" when the victim was five years old, was sufficient to prove the age element of sexual offenses requiring that the defendant be 10 years older than the victim. (*Id.* at pp. 202-204.) *Montalvo* and *Castaneda* thus suggest that, in some cases, where the prosecution pleads and must prove the age element of an offense and the court instructs on it, the reviewing court may consider the jury's observation of the defendant in evaluating the sufficiency of the evidence on that element. Neither case stands for the proposition that, where a witness describes a perpetrator's appearance and the jury finds the defendant guilty, we must presume the defendant matched the witness's description in all or even any respects.

The only other additional evidence—i.e., in addition to the presence of Karels's DNA inside the car—cited by the majority is the presence of Karels's DNA, in more or less equal proportion to

4

Powell's (52 percent to 48 percent), next to the windshield cutout near where the VIN plate was removed.  From that evidence of relative parity in the two men's DNA next to the cutout, the majority concludes the jury could have reasonably inferred Karels "cut open the windshield after the murder in order to remove the car's VIN plate to avoid detection as Powell's killer" because Karels knew the traffic stop 18 days earlier might link him to the car.  (Maj. opn. *ante*, at p. 16.)

I think that's quite a leap, one not even the Attorney General was willing to make.  In fact, the Attorney General attached no particular significance to the presence of Karels's DNA next to the hole in the windshield.  And again, in my view, for good reason:  Rather than sticking to the "'facts that can "logically and reasonably be drawn" from the evidence,'" the majority's analysis rests on "'evidence which 'merely raises a possibility' a particular fact is true,'" that is, on impermissible "speculation."  (*People v. Bell* (2020) 47 Cal.App.5th 153, 180; see *People v. Davis* (2013) 57 Cal.4th 353, 360 [a "'"finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence"'"]; *People v. Hughes* (2002) 27 Cal.4th 287, 365 ["'a jury may not rely upon unreasonable inferences,'" and "'[a]n inference is not reasonable if it is based only on speculation'"].)

The series of supposedly reasonable inferences the majority constructs from the presence of Karels's DNA next to the hole in the windshield seems insufficiently supported by logic or evidence.  (See *People v. Ware* (2022) 14 Cal.5th 151, 172 [deductions that are "highly speculative" and require "a number of inferential leaps" are not substantial evidence].)  For example, if Karels was so concerned law enforcement would link him to the

car because of the traffic citation, why would he use the car as a murder weapon in the first place?  And are we to suppose (i.e., speculate) Karels knew just enough about vehicle identification numbers to think of removing the VIN plate from the dash, but not enough to know the VIN was readily retrievable from other locations on the car?[13]  Similarly, the majority's accounting for the nearly equal amount of Powell's DNA around the windshield cutout is simply guesswork—nothing in Palomo's testimony or the surveillance video indicates Powell's body was thrown onto the windshield.  (See *Ware*, at p. 167 [a reasonable inference "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work" (internal quotation marks omitted)].)

In my view, while Karels may have committed this murder, the People did not prove it beyond a reasonable doubt, and substantial evidence does not support his conviction.  Therefore, I would reverse the conviction.



SEGAL, J.

---

[13]  Sheriff's Department investigators appear to have had no difficulty locating the VIN on the car.  (See *United States v. Wallace* (2d Cir. 2019) 937 F.3d 130, 134 ["The VIN . . . is required by law to be printed on each vehicle in multiple locations.  49 CFR § 565.13.  Among other locations, the VIN must be printed . . . on the Federal Label, which is a sticker affixed to the 'hinge pillar, door-latch post, or the door edge that meets the door-latch post, next to the driver's seating position' (the 'doorjamb').  49 C.F.R. § 567.4."].)

6